UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JASON SHANE NEUHAUS,

Plaintiff,

v.

SUZANNE M. PEERY,

Defendant.

Case No. 20-cv-07385-HSG

**ORDER DENYING PETITION FOR HABEAS CORPUS**

Re: Dkt. No. 1

Petitioner Jason Shane Neuhaus filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction and sentence in Contra Costa County Superior Court.  Dkt. No. 1 ("Pet.").  Petitioner is currently serving an aggregate state sentence of 266 years and four months to life imprisonment for infliction of corporal injury; first degree burglary with a person present in the residence; attempted kidnapping; misdemeanor battery on a cohabitant; two counts of felony vandalism; premeditated attempted murder; two counts of assault with a deadly weapon; attempted voluntary manslaughter; attempted explosion of an explosive or destructive device with the intent to commit murder; 10 counts of premeditated attempted murder of a peace officer; 10 counts of assault on a peace officer with a semiautomatic firearm; and 10 counts of resisting an executive officer.  Dkt. No. 13-5, Ex. 1C at 648–762.  Respondent has filed an answer, Dkt. No. 13 ("Answer"), and Petitioner has filed a traverse, Dkt. No. 15.  The Court has carefully considered the briefs submitted by the parties, and **DENIES** the petition for the reasons detailed below.

## I.    PROCEDURAL HISTORY

On February 3, 2017, a jury in Contra Costa County Superior Court found Petitioner guilty of infliction of corporal injury; first degree burglary with a person present in the residence; attempted kidnapping; misdemeanor battery on a cohabitant; assault by means of force likely to

1    produce great bodily injury; two counts of felony vandalism; premeditated attempted murder; two

2    counts of assault with a deadly weapon; attempted voluntary manslaughter; attempted explosion of

3    an explosive or destructive device with the intent to commit murder; 10 counts of premeditated

4    attempted murder of a peace officer; 10 counts of assault on a peace officer with a semiautomatic

5    firearm; and 10 counts of resisting an executive officer.  The jury also found true allegations of

6    infliction of great bodily injury, deadly weapon use, and personal firearm use for purposes of

7    sentencing enhancements.  *See* Dkt. No. 13-5, Ex. 1C at 648–762.  On May 12, 2017, the trial

8    court sentenced Petitioner to a total term of 266 years and four months to life in state prison.  *Id.* at

9    780–786, 821–827.

10         Petitioner timely appealed, and on May 1, 2019, the California Court of Appeal reversed

11   the conviction for assault by means of force likely to produce great bodily injury, and remanded

12   for either retrial or reduction of the conviction to simple assault.  *See* Dkt. No. 14-2, Ex. 6 at 199–

13   216.[1]  The California Court of Appeal also reversed the sentences for 10 of the firearm

14   enhancements, and remanded for the trial court to exercise its discretion to determine whether to

15   strike the enhancements, and to re-enter judgment accordingly.  The court otherwise affirmed the

16   judgment.  *Id.*  On July 31, 2019, the California Supreme Court denied Petitioner's petition for

17   review.  *See* Dkt. No. 14-2, Ex. 8 at 264.  On remand, the trial court struck the aggravated assault

18   conviction, but declined to strike any of the firearm enhancements.  *See* Dkt. No. 14-2, Ex. 9 at

19   268–273.  Petitioner did not appeal the resentencing.  *See* Pet. at 3.  Petitioner then filed this

20   federal petition for a writ of habeas corpus on October 21, 2020.  *See id.*

21   **II.    BACKGROUND**

22         The following factual background is taken from the May 1, 2019 opinion of the California

23   Court of Appeal:[2]

24

25   _____

[1] For ease of reference, the Court refers to the PDF pagination for this document.

26   [2] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*,
     853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds

27   that it can reasonably conclude that the state court's summary of facts is supported by the record
     and that this summary is therefore entitled to a presumption of correctness, unless otherwise

28   indicated in this order.  *See Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), *overruled
     on other grounds by Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).

United States District Court
Northern District of California

On the morning of October 10, 2014, defendant physically assaulted his long-term live-in girlfriend Diane.  After Diane escaped, she stayed with her sister and brother-in-law for a few days.  On October 14, 2014, defendant appeared at Diane's sister's house and again physically assaulted Diane.  Diane's brother-in-law was injured when he attempted to intervene in the assault.  Diane's sister was seriously injured when defendant chased her with his car and then rammed his car against the front of her home.  The police arrived after defendant had driven away.

While the police were still there, defendant's mother left Diane a voicemail message.  In the message, defendant's mother said defendant had called her and told her that he had driven through the house, was wanted for kidnapping, was going to commit suicide, was going to blow himself up, and that he had propane tanks at his residence.  The Special Weapons And Tactics Team (SWAT) responded to defendant's home.  They were informed that in addition to the propane tanks, defendant had access to pistols and possibly a rifle.

Officers set up a perimeter around the residence and evacuated the neighbors due to the risk of an explosion.  The SWAT team arrived in their uniforms and with an armored truck and an old bus that was used as a command center and illuminated the area with spotlights.

Ten members of the SWAT team approached the house and attempted to enter the front door.  The officer assigned to breach the door was positioned in front of the door with a sledgehammer.  The rest of the entry team was lined up on each side of him, between three and fifteen feet from the door.  As the first officer began hitting the door, some of the officers heard four or five popping sounds, like gunfire, coming from inside the house.  Others reported hearing the sounds of something pinging metal-on-metal.  This caused the officers to back away from the house.

On their next attempt, the SWAT team broke open the front door.  Inside, they saw a propane tank with ammunition on top of the tank.  On the far side of the family room, there were several blankets piled up and an open umbrella that appeared to be a sniper loft or shooting blind.  The SWAT team retreated for officer safety and sent in a robot with cameras.

Throughout the standoff, a police negotiator was communicating with defendant.  The negotiator made repeated calls to defendant.  Each time defendant would answer, talk, and then hang up.  The negotiator called back each time a few minutes later.  Defendant was angry, swearing, and yelling insults.  Defendant repeatedly expressed his distrust of the police and said multiple times he was not going to live through this scenario, and that the police only wanted to see him die.  According to the negotiator, defendant said that "he planned on going out and taking us with him."  Defendant's exact words were, "You're all fucked up and that's why you all need to die with me."  When asked about the propane tank near the front door, defendant said the propane was there so that "he could go up in a ball of flame[s]."  When the officer asked whether defendant had altered the cans so that they would explode, defendant replied "sure" but refused to give the negotiator any additional details.

3

After several hours, defendant agreed to exit the house and was taken into custody. When officers searched his house they found that the propane tank near the front door had a plastic bag containing 125 bullets on top of it. They found several other improvised explosive devices throughout the house, including other propane tanks with bullets taped to the top. There were two distinct dimples in the propane tank located near the front door that appeared to have been caused by bullets striking the tank. There also appeared to be remnants of bullets near this tank. A partially loaded .45 caliber magazine was found on the floor near the sniper blind.

The prosecution's expert in fire and arson investigations opined that if someone were to shoot at a seven-gallon propane tank that had live ammunition on it, it was possible to cause a fire or explosion large enough to injure or kill people in the area. A member of the bomb squad, who also testified as an expert, explained how a propane tank with ammunition on its top could cause an explosion: If a bullet penetrated the tank and caused propane to leak out, a second bullet strike or a gun muzzle flash could potentially ignite the leaked propane and cause the area to catch fire and possibly explode in different directions. He opined that had the propane been ignited in this instance, the exterior wall could have exploded or come apart from the rest of the structure. If there were people within 10 to 15 feet of the wall, an exterior wall could have blown off and injured them.

Defendant denied assaulting Diane or her family members. He claimed he had not tried to hit anyone with his car and that Diane's sister dove in front of his truck, causing him to slam on his brakes and hit the post in front of the house with his driver's side mirror. He panicked and tried to back up, but instead accidentally drove forward into the house. On his way home, he realized that he would likely be going to jail for the rest of his life. He called his mom and told her he was likely going to commit suicide. He knew that the police would be coming and he needed time to gather the courage to commit suicide, so he barricaded the house. He also placed the propane tanks inside the residence to buy himself more time to convince himself to commit suicide. He believed if the police saw the propane tanks, they would back off and give him more time to do so. He denied putting ammunition on top of the tanks. He admitted that he heard the police beating on the front door and that he shot about three times into the front room but he denied that he was intentionally shooting at the propane tank. When asked on cross-examination what he meant by his statements to the police negotiator, defendant testified, "I suppose I meant that if I die, it wouldn't hurt to take bad cops with me."

*See* Dkt. No. 14-2, Ex. 6 at 200–203.

### III.   LEGAL STANDARD

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

4

United States District Court
Northern District of California

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Id.* at 405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)).  Accordingly, in reviewing the habeas claims not addressed by the state appellate

court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA. *Id.* at 102.

## IV.    DISCUSSION

### A.    Insufficient Evidence

As an initial matter, Petitioner argues that insufficient evidence supported the 10 convictions for attempted murder of a peace officer. Traverse at 6–15. The California Court of Appeal denied the claim as follows:

> Attempted murder requires proof of " ' "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." ' " (*People v. Perez* (2010) 50 Cal.4th 222, 229.) Here, the prosecution argued that when defendant fired his gun into the propane tank located near the front door of his home, he committed an attempted murder of each of the 10 police officers who were attempting to enter the residence. Defendant does not dispute that there is substantial evidence to support the jury's finding that he shot at the propane tank and thus, attempted to cause an explosion. He argues that there is no substantial evidence to support the finding that he did so with the specific intent that the explosion kill all 10 officers.

> " ' "The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]" [Citation.] In contrast, "[a]ttempted murder requires the specific intent to kill." ' " (*People v. Perez, supra*, 50 Cal.4th at p. 229.) " ' "[G]uilt of attempted murder must be judged separately as to each alleged victim." ' " (*Id.* at p. 230.) Thus, in order for defendant to be convicted of the attempted murder of each of the ten officers standing outside his door, the prosecution was required to prove he acted with the specific intent to kill each officer. (*Ibid.*)

> Whether a defendant possesses the requisite intent to kill must be derived from all the circumstance, including the defendant's actions and words. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) A specific intent to kill can also be proven where the evidence establishes that the defendant "used lethal force designed and intended to kill everyone in an area around the targeted victim (*i.e.*, the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*People v. Smith* (2005) 37 Cal.4th 733, 746; *People v. Perez, supra*, 50 Cal.4th at p. 232 [Examples of such circumstances include "using an explosive device with intent to kill everyone in the area of the blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill everyone fired upon."].) "The kill zone theory consequently does not operate as an exception to the mental state requirement for attempted murder or as a means of somehow bypassing that requirement. In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that everyone in the kill zone

die.  If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder."  (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798.)

Here, defendant told the police negotiator that he intended to blow up the house, killing himself and all of the police officers.  He then attempted to ignite the explosive device by shooting at the propane tank five times.  Nonetheless, defendant contends that the "expert testimony established only that an explosion was possible" and that, if an explosion had occurred, it was possible the officers would have been injured rather than killed.  He suggests that "any loss of life in this case was extraordinarily speculative."  However, the prosecutor was not required to prove that the explosive device necessarily would have killed all 10 officers had it exploded.  " '[W]hen commission of the substantive offense is factually impossible, a defendant may be convicted of an attempt to commit the offense when it is proven that he had the specific intent to commit the offense and did those acts he believed necessary to consummate it but failed to commit the statutory offense because, unknown to the actor, one or more of the essential elements of the offense were lacking.' [Citation.]  Thus, a defendant may be convicted of an attempt to commit a crime where there is sufficient evidence to demonstrate that the means used by the defendant, together with the surrounding circumstances, made the intended crime apparently possible.  ' "If there is an apparent ability to commit the crime in the way attempted, the attempt is indictable, although, unknown to the person making the attempt, the crime cannot be committed, because the means employed are in fact unsuitable, or because of extrinsic facts, such as the nonexistence of some essential object, or an obstruction by the intended victim, or by a third person." ' "  (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1383–1384 [upholding conviction for attempting to encourage another person to commit suicide where defendant helped the victim obtain 100 pills which, unknown to either defendant or the victim, would not have been lethal]; *see also People v. Siu* (1954) 126 Cal.App.2d 41, 43–44 [upholding conviction for attempted possession of narcotics, where defendant was in possession of white talcum powder he believed was heroin].)  Here, the experts testified that the device had the potential to explode, which in turn could cause the building to collapse and could turn the bullets taped to the top of the tank into shrapnel.  While death was not guaranteed in an explosion, the device had the apparent ability to kill the officers attempting to enter the front door.  This evidence coupled with defendant's statements establish an intent to use what he believed to be lethal force to kill all of the officers.

Nothing in the record suggests that defendant intended to kill only the officer closest to his front door.  That defendant did not know exactly how many officers were outside his door does not preclude a finding that he intended to kill every one of them.  (*See People v. Vang* (2001) 87 Cal.App.4th 554, 563–564 ["The jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of highpowered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up.  [Citation.] . . .  The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed."].)  Finally, the fact that defendant apparently fired too quickly to successfully ignite the device does not suggest that defendant did not intend for it to explode when he fired the gun.  Accordingly, substantial evidence supports defendant's attempted murder convictions.

1    *See* Dkt. No. 14-2, Ex. 6 at 203–206.

2              **i.    Legal Standard**

3        The Due Process Clause "protects the accused against conviction except upon proof

4    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5    charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

6    evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

7    rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

8    *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

9    relief, *see id.* at 324.

10       The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas

11   proceedings . . . ." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (finding that court

12   of appeals "unduly impinged on the jury's role as factfinder" and failed to apply the deferential

13   standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence

14   was insufficient to support petitioner's conviction).  A federal court collaterally reviewing a state

15   court conviction does not determine whether it is satisfied that the evidence established guilt

16   beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510

17   U.S. 843 (1993); *Coleman*, 566 U.S. at 656 ("[T]he only question under *Jackson* is whether [the

18   jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality.").

19   The federal court "determines only whether, 'after viewing the evidence in the light most

20   favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

21   the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at

22   319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt

23   has there been a due process violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

24       In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential

25   standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).  *First*, relief must be denied

26   if, viewing the evidence in the light most favorable to the prosecution, there was evidence on

27   which "*any* rational trier of fact could have found the essential elements of the crime beyond a

28   reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324) (emphasis in original).  *Second*, a state

United States District Court
Northern District of California

1   court decision denying a sufficiency challenge may not be overturned on federal habeas unless the

2   decision was "objectively unreasonable."  *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

3          ii.     **Analysis**

4          The state court decision to which Section 2254(d) applies is the "last reasoned decision" of

5   the state court.  *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.  Although *Ylst* was a

6   procedural default case, the "look through" rule announced there has been extended beyond the

7   context of procedural default.  *Barker*, 423 F.3d at 1092, n.3 (citing *Lambert v. Blodgett*, 393 F.3d

8   943, 970, n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)).   In

9   reviewing each claim, the court must examine the last reasoned state court decision that addressed

10  the claim.  *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir.

11  2013).

12         The look through rule is applicable here because the Ninth Circuit has held that "it is a

13  common practice of the federal courts to examine the last reasoned state decision to determine

14  whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly

15  established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this

16  practice without making its intention clear."  *Cannedy*, 706 F.3d at 1158.  While under the look

17  through rule the habeas court "should . . . presume that the unexplained decision adopted the same

18  reasoning" as the last reasoned decision, "the State may rebut the presumption by showing that the

19  unexplained affirmance relied or most likely did rely on different grounds that the lower state

20  court's decision, such as alternative grounds for affirmance that were briefed or argued to the state

21  supreme court or obvious in the record it reviewed."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192

22  (2018).

23         With respect to this issue, the Court thus reviews the California Court of Appeal's order,

24  which was the last reasoned decision as to this issue, and finds that Petitioner's insufficiency of

25  the evidence claim fails.  First, viewing the evidence in the light most favorable to the prosecution,

26  the Court cannot conclude that no rational trier of fact could have found the essential elements of

27  the claim beyond a reasonable doubt.  The evidence at trial showed that Petitioner barricaded

28  himself in his house, placed a propane tank with bags of bullets on top of it by the front door, and

United States District Court
Northern District of California

9

1    set up a sniper blind in direct sight of that propane tank.  *See* Dkt. No. 13-9, Ex. 2D at 44–45.  The

2    record also included evidence suggesting that Petitioner fired at the propane tank four or five times

3    when the ten officers were attempting to breach the door, and that exploding the tank could have

4    caused the bullets to be expelled.  *See id.* at 39, 59–61, 71; Dkt. No. 13-10, Ex. 2E at 29–30, 83–

5    85, 88, 129–30; Dkt. No. 13-12, Ex. 2G at 191–92.  And in addition to multiple statements

6    referencing the propane tanks and "blowing up" the house or "going up in a ball of flame,"

7    Petitioner told a police negotiator that "he planned on going out and taking [the police] with him,"

8    and that that the officers "all need to die with me."  *See* Dkt. No. 13-11, Ex. 2F at 117–18.  The

9    court of appeal was not unreasonable in concluding that "[w]hile death was not guaranteed in an

10   explosion, the device had the apparent ability to kill the officers attempting to enter the front

11   door," and that "[t]his evidence coupled with defendant's statements establish an intent to use

12   what he believed to be lethal force to kill all of the officers."  *See* Dkt. No. 14-2, Ex. 6 at 206.

13   Viewing the evidence in its totality and in the light most favorable to the prosecution, a reasonable

14   jury thus readily could have found that Petitioner created a device capable of killing, and that he

15   intended to use it to kill all ten officers.

16         Second, Petitioner argues at length that the evidence was insufficient based on his own

17   interpretation of the requirements of California law.  *See, e.g.*, Traverse at 11 (arguing that

18   "[u]ltimately, the evidence in this case showed petitioner committed an act that endangered the life

19   of all the officers at the scene, but was insufficient to support multiple attempted murder

20   convictions" (citing *People v. Perez*, 50 Cal. 4th 222, 230 (Cal. 2010)).  But a habeas court may

21   not second-guess the state court's interpretation of its own state's law.  *See Estelle v. McGuire*,

22   502 U.S. 62, 67–68 (1991) (explaining that "it is not the province of a federal habeas court to

23   reexamine state-court determinations on state-law questions"); *Mendez v. Small*, 298 F.3d 1154,

24   1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law.").

25         The California Court of Appeal's rejection of Petitioner's sufficiency of the evidence

26   challenge was not objectively unreasonable, and habeas relief is denied as to this ground.

27         **B.    Jury Instructions**

28         Petitioner contends that the jury was erroneously instructed on a "kill zone" theory of

liability as to the charges of attempted murder of a peace officer.  Traverse at 15–22.  The California Court of Appeal denied the claim as follows:

> The jury was instructed on the elements of attempted murder in relevant part as follows: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffectual step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.  A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action.  A direct step indicates a definite and unambiguous intent to kill.  It is direct movement toward the commission of the crime after preparations are made.  It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."
>
> With respect to the kill zone theory of liability, there was an obvious apparently inadvertent omission in the CALCRIM instruction, both as written and as read to the jury.  The jury was instructed that "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' [¶]  In order to convict the defendant of the attempted murder of Paul Vandiver, Michael Roberts, Carl Cruz, Bradley Giacobazzi [sic], Greg Pardella, David Espinosa, Matthew Forristall, Timothy Elsberry, Blake Roberts, and Lyle Robles, or intended to kill Michael Roberts, Carl Cruz, Bradley Giacobazzi [sic], Greg Paredella [*sic*], David Espinosa, Matthew Forristall, Timothy Elsberry, Blake Roberts, and Lyle Robles or intended to kill Paul Vandiver by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Paul Vandiver, Michael Roberts, Carl Cruz, Bradley Giacobazzi, Greg Pardella, David Espinosa, Matthew Forristall, Timothy Elsberry, Blake Roberts, and Lyle Robles."
>
> The second paragraph of the kill zone instruction, CALCRIM No. 600, reads as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of _____ <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, the People must prove that the defendant not only intended to kill _____ <insert name of primary target alleged> but also either intended to kill _____ <insert name or description of victim charged in attempted murder count[s] on concurrent intent theory>, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill _____ <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>, or _____ <insert name of primary target alleged> by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of _____ <insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory>."  While defendant is correct that the omitted language rendered the instruction nonsensical, the error was not prejudicial.
>
> As defendant acknowledges, an instruction on the kill zone theory is not required.  (*People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6.)  "[O]rdinary instructions on attempted

murder . . . provide all the necessary legal tools" to permit the jury to draw the inference that the means of killing employed by the defendant supports the conclusion that the defendant specifically intended to kill every person in the area. (*People v. McCloud*, *supra*, 211 Cal.App.4th at p. 803.)  Moreover, the first paragraph of the kill zone instruction properly informed the jury that "[a] person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' "  As the Attorney General states, "No element of the crime was eliminated.  Nor was the burden of proof lowered.  The instruction required the jury make all the necessary findings to support each charge of attempted murder."  Moreover, the verdict forms finding defendant guilty of the attempted murder of each officer found true that "[t]he attempted murder was willful, deliberate, and premeditated."  There is no reasonable likelihood that the jury was confused or misled by the instruction given or that a proper instruction would have resulted in a more favorable outcome for defendant.

*See* Dkt. No. 14-2, Ex. 6 at 206–08.

### i.  Legal Standard

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle*, 502 U.S. at 71–72.  A habeas petitioner is not entitled to relief unless an instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  A claim of state instructional error can be the basis of federal habeas relief only if the error, considered in light of all the instructions given in addition to the trial record, "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S at 72 (quotation omitted).

Where a petitioner claims an instruction was ambiguous, in order to show a due process violation, petitioner must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009) (quotations omitted).  This standard requires petitioner to show more than a "possibility" of misunderstanding, *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), or that the jurors "could have" misinterpreted the instructions, *Tyler v. Cain*, 533 U.S. 656, 658, n.1 (2001).  A habeas court "must review a state court's resolution of an error in a state-law jury instruction 'through the deferential lens of AEDPA.'"  *Byrd v. Lewis*, 566 F.3d 855, 862 (9th Cir. 2009) (quoting *Waddington*, 555 U.S. at 194).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The challenged instruction must be evaluated in light of the instructions as a whole and the

2  evidence introduced at trial. *Estelle*, 502 U.S. at 72; *Johnson v. Texas*, 509 U.S. 350, 368 (1993)

3  ("In evaluating the instructions, we do not engage in a technical parsing of this language of the

4  instructions, but instead approach the instructions in the same way that the jury would—with a

5  commonsense understanding of the instructions in the light of all that has taken place at the trial.")

6  (quotation omitted); *Francis v. Franklin*, 471 U.S. 307, 315 (1985) ("Other instructions might

7  explain the particular infirm language to the extent that a reasonable juror could not have

8  considered the charge to have created an unconstitutional presumption."); *Cupp v. Naughton*, 414

9  U.S. 141, 146–47 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation,

10  but must be viewed in the context of the overall charge.").

11    A determination that there is a reasonable likelihood that the jury has applied the

12  challenged instruction in a way that violates the Constitution establishes only that an error has

13  occurred. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is found, the court also

14  must determine that the error had a substantial and injurious effect or influence in determining the

15  jury's verdict before granting relief in habeas proceedings. *See Brecht*, 507 U.S. at 637. In

16  addition, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court

17  cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one

18  Congress prescribed in AEDPA." *Brown v. Davenport*, 596 U.S. 118, 122 (2022). A jury

19  instruction that omits an element of an offense is constitutional error subject to harmless error

20  analysis. *See Neder v. United States*, 527 U.S. 1, 8–11 (1999) (direct review); *Evanchyk v.

21  Stewart*, 340 F.3d 933, 940 (9th Cir. 2003) (§ 2254 case). Harmless error applies whether the

22  error is characterized as a misdescription of an element of an offense in a jury instruction, or as an

23  omission of the element. *See California v. Roy*, 519 U.S. 2, 5 (1996) (omission of "intent"

24  element from aiding and abetting instruction subject to harmless error analysis where jury could

25  have found intent based on evidence it considered). Even an instruction that lessen the

26  prosecution's burden will be subject to harmless error review, rather that structural error review,

27  "unless *all* the jury's findings are vitiated." *Byrd*, 566 F.3d at 864 (finding that of harmless error

28  analysis of a defective jury instruction was proper because the instructional error concerned only

1   one element and did not vitiate the jury's finding of guilt on the charged offense) (citing *Hedgpeth*

2   *v. Pulido*, 555 U.S. 57, 60–61 (2008)) (emphasis in original).

3           ii.     **Analysis**

4           Here again, the California Court of Appeal rejected Petitioner's instructional error claim in

5   a reasoned opinion, so this Court looks through the California Supreme Court's silent denial of

6   this claim and reviews that last reasoned opinion.

7           Petitioner argues that the trial court erred in instructing the jury on the "kill zone" theory of

8   liability because the instruction was "both legally incorrect and ultimately nonsensical."  Traverse

9   at 17.

10          First, to the extent Petitioner argues that the Court of Appeal wrongly determined as a

11  matter of state law that the "kill zone" instruction applied given the trial evidence, *see* Traverse at

12  18–22, that argument simply is not cognizable on federal habeas.  *Estelle*, 502 U.S. at 67–68

13  (explaining that "it is not the province of a federal habeas court to reexamine state-court

14  determinations on state-law questions"); *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002)

15  ("A state court has the last word on the interpretation of state law.").  This remains true

16  notwithstanding Petitioner's claim that California Supreme Court and Court of Appeal cases

17  issued after the Court of Appeal's decision in this case confirm the inaccuracy of the "kill zone"

18  instruction as a matter of state law.  Similarly, this Court may not on habeas review question the

19  Court of Appeal's conclusion that California law does not require such an instruction in any event

20  because the attempted murder instruction itself adequately conveys the relevant concepts.

21          Second, with respect to the trial court's mistaken omission of language in a way that made

22  the instruction nonsensical, the Court of Appeal's finding that Petitioner was not prejudiced by

23  that error was not contrary to or a misapplication of clearly established law or based on an

24  unreasonable determination of the facts.  "When a *Chapman* [harmless error] decision is reviewed

25  under AEDPA, a federal court may not award habeas relief under § 2254 unless *the harmlessness*

26  *determination itself* was unreasonable."  *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quotation

27  omitted) (emphasis in original).  This means that the petitioner must show "that the state court's

28  decision to reject his claim was so lacking in justification that there was an error well understood

United States District Court
Northern District of California

14

1    and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at

2    269–70 (quotation omitted).

3         Petitioner fails to meet this high standard here.  The Court of Appeal recognized, correctly,

4    that at a minimum the instruction as given left out the phrase "the People must prove that the

5    defendant not only" from the model instruction, with the result that part of the instruction was an

6    incoherent non-sentence.  Dkt. No. 14-2, Ex. 6 at 206–08.  But the Court of Appeal further found

7    that the first paragraph of the instruction actually given properly informed the jury of the relevant

8    concepts, and that the instruction did not eliminate any element of the crime or lower the burden of

9    proof.  *Id.*  And the Court of Appeal pointed out that the verdict forms finding Petitioner guilty of

10   the attempted murder of each officer found true that "the attempted murder was willful, deliberate

11   and premeditated."  *Id.* at 208 (internal quotations and alterations omitted).  Ultimately, the Court

12   of Appeal concluded that "[t]here is no reasonable likelihood that the jury was confused or misled

13   by the instruction given or that a proper instruction would have resulted in a more favorable

14   outcome for defendant."  *Id.*  Fair-minded jurists could agree with that well-reasoned and well-

15   supported conclusion, so the state court's harmlessness determination was not unreasonable.

16        Finally, even if there had been any federal constitutional error here, any such error did not

17   have a substantial and injurious effect or influence on the jury's verdict under *Brecht*.  As

18   described above, Petitioner's conduct and statements overwhelmingly established his intent to kill

19   all of the officers present at the door, such that the claimed instructional error would not have

20   prejudiced him even if the Court were to accept Petitioner's theory of error.

21        Habeas relief is denied as to this claim.

22        **C.    Prosecutorial Misconduct**

23        Petitioner similarly contends that the government misstated the applicable law related to

24   the "kill zone" theory of liability in its closing argument.  *See* Traverse at 23–27.  The California

25   Court of Appeal denied the claim as follows:

26        In her closing argument, the prosecutor correctly and completely laid out the relevant legal
         principles relating to attempted murder, including that the "act of a person who intends to
27       kill another person will constitute attempt where those acts clearly indicate a certain
         unambiguous intent to kill."  With respect to the counts relating to the ignition of a

28

United States District Court
Northern District of California

destructive device with the intent to commit murder, the prosecutor argued, "So this is where we have to look into the defendant's mind, his intent.  What was he doing?  What was his intent by trying to explode the propane tanks?  Well, that's what a bomb is.  A bomb is designed to kill people.  It's designed to explode.  It has no other purpose than to destroy."  She added, "*He was trying to explode that propane tank and cause those officers on the other side to either be killed or injured seriously.  That was his intent*, to blow up the propane tank, which is why he shot at it five times.  We have five spent shell casings.  It didn't work the way he planned it, but that doesn't mean he didn't try.  It wasn't for lack of trying.  It just means he sucks at making a bomb."  (Italics added.)

With respect to the specific counts relating to the attempted murder of the officers, she argued, "So in order to prove attempted murder, it's the same elements as before, with the other attempted murder on Diane and [her sister].  It's the same count, same element, in that he took at least one direct step and, in this case, this would be him trying to blow up the . . . explosive device at the door — toward killing another human being, the officers on the other side of the door, and that he had the intent to kill. [¶]  We just talked about his intent to kill in the last count.  It's the same intent that's required for attempted murder, and this is the same element[] as before.  *The difference with this is that there is an instruction, CALCRIM 600, that says a person who primarily intends to kill one person -- which would be the breacher, the person at the door, that that intent transfers to everybody else in that area. [¶]  So when you intend -- you are not aiming at a person, you are just going to blow up an area, and whoever is in that area is going to be hurt, and that's what -- he didn't care.*  It didn't matter to him.  It could have been two officers.  It could have been ten.  It could have been twenty.  It didn't matter to him.  He just wanted to blow it up. [¶]  And he told you, I just was going to take as many bad cops with me as I could.  He didn't know those police officers.  He had never seen them before.  But he thinks they are all bad because he has had a hatred of cops since he was three, because he had a bad experience with his father.  And so he grew up with a hatred of cops.  And he said, I was going to take as many bad cops with me as I could because he considers all cops bad. [¶]  And so his intent is concurrent with that person at the door, because he has that bomb at the door; so whoever is at the door, he wants to take them out and everybody else in the kill zone. [¶] . . . [¶]  *So if this bomb had worked the way he intended it to work, why would we not assume that there is going to be some fragments, shrapnel, glass, plaster, wall, that would explode in this area and injure or kill these officers.  That was what his intention was.* [¶]  So he intended to – whoever is at this door, he wants to explode this bomb and everybody else in the kill zone."  (Italics added.)

Subsequently, during the rebuttal portion of her closing argument, the prosecutor additionally argued, "there ain't no doubt about it, he intended — he told you up there, if I was going to go, I was going to take some bad cops with me. . . .  [H]e said that on the stand, but now he wants you to think he wasn't trying to kill them.  How was [he] going to take them with you?  What were you trying to do?"  She then explained how she chose to charge defendant with 10 attempted murders:  *"We charge the people that are immediately in danger, at the door, that are immediately in the zone of danger*, as he is trying to explode that propane tank.  Those are the ten officers that we charged.  *We don't charge them at the [other location] because they are not in that zone of danger*.  That's fifteen to twenty feet at the door."  (Italics added.)

Defendant contends the italicized portions of the prosecutor's closing argument were

incorrect or misleading.[FN2]

> [FN2] Defendant concedes that no objection was made in the trial court but argues that the issue should nevertheless be decided on its merits because defendant received ineffective assistance of counsel due to defense counsel's failure to properly object. In the interest of efficiency, we review and reject defendant's argument as discussed below.

Taken as a whole, however, we find no prejudicial error in the prosecutor's argument. The jury was clearly instructed that it was required to find a specific intent to kill for each officer and that a person may specifically intend "to kill everyone in a particular zone of harm or 'kill zone.' " It was also instructed that if the prosecutor's comments on the law conflict with the instructions given by the court, the jury should disregard the comment and follow the court's instructions. Although the prosecutor's argument most often referred to an intent only to kill, her several references to "kill or injure" were misleading and should not have been made. However, those references conflicted with the overall tenor of her argument and, more importantly, with the court's instructions. We presume the jury followed the instructions, not the prosecutor's misstatements.

The prosecutor's comment that defendant "didn't care" how many officers he killed in the blast cannot reasonably be understood as saying that the jury need not find specific intent to kill each victim. The prosecutor emphasized that defendant's intent was to explode a bomb that would kill everyone in the blast zone. While the prosecutor's reference to transferred intent in discussing CALCRIM No. 600 was potentially misleading, there is no likelihood the jury concluded that if it found that defendant intended to kill one officer, that intent transferred to the other officers. The jury was not given an instruction on transferred intent. To the contrary, the jury was instructed to find a specific intent to kill as to each victim. Finally, the prosecution's reference to a "zone of danger" does not suggest, as defendant argues, that implied malice is sufficient to convict defendant of attempted murder. The prosecutor was clearly delineating the geographic area in which the bomb blast could be considered lethal. Defendant could not reasonably have intended to kill officers more than 15 to 20 feet from the building. In short, we find no prejudicial error in the prosecutor's closing argument.

*See* Dkt. No. 14-2, Ex. 6 at 209–211.

### i.   Legal Standard

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112

(9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments or remarks for AEDPA review purposes).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (quotation omitted); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

When determining whether the misconduct rises to the level of a due process violation, the Court may consider factors such as:  (1) the weight of evidence of guilt, *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt), *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required based on prosecutor's reference to defendant's courtroom demeanor);  (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstated or manipulated the evidence, *see Darden*, 477 U.S. at 182.

A prosecutor's mischaracterization of a jury instruction is less likely to render a trial fundamentally unfair than if the trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.  Arguments of counsel which misstate the law are subject to objection and to correction by the court.  This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

*Boyde v. California*, 494 U.S. 370, 384–85 (1989) (citations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

ii.     **Analysis**

The Court of Appeal found no prejudicial error in the prosecutor's argument taken as a whole, even though it found that several references to "kill or injure" were misleading and should not have been made.  That conclusion was not unreasonable based on the factual record.  And it also was not contrary to or an unreasonable application of clearly established Supreme Court law.  Other than citing a general standard from *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), Petitioner cites only California cases and one Ninth Circuit case in his argument.  *See* Traverse at 23–27.  Well-established controlling precedent confirms that juries are assumed to follow the court's instructions if they conflict with counsel's arguments, *see Boyde*, 494 U.S. at 384–85.  Accordingly, the Court finds that the California Court of Appeal's denial of Petitioner's prosecutorial misconduct claim was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, and was not based on an unreasonable determination of the facts.

**D.     Ineffective Assistance of Counsel**

Lastly, Petitioner contends that his trial attorney rendered ineffective assistance of counsel both by failing to object to the "kill zone" jury instruction and by failing to object to the government's closing argument regarding this theory of liability.  *See* Traverse at 27–30.  The Court previously discussed the "kill zone" jury instruction and the prosecutor's closing argument in Sections IV.B and IV.C above.

i.     **Legal Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*  The right to effective assistance counsel applies to the performance of both retained and appointed counsel without distinction.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344–45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must

establish two things.  *First*, he must establish that counsel's performance was deficient, *i.e.*, that it

fell below an "objective standard of reasonableness" under prevailing professional norms.

*Strickland*, 466 U.S. at 687–88, *see also Andrus v. Texas*, 140 S. Ct. 1875, 1881 (U.S. June 15,

2020) (per curiam).  *Second*, he must establish that he was prejudiced by counsel's deficient

performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694;

*Andrus*, 140 S Ct. at 1881.  A reasonable probability is a probability sufficient to undermine

confidence in the outcome.  *Id.*  Where a petitioner has failed to meet the *Brecht* harmless error

standard with respect to a particular claim, the Ninth Circuit has held that the petitioner necessarily

"cannot meet the higher *Strickland* standard of prejudice."  *Kipp v. Davis*, 971 F.3d 866, 878 (9th

Cir. 2020) (citing *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995)).

　　　　　The *Strickland* framework for analyzing ineffective assistance of counsel claims is

considered to be "clearly established Federal law, as determined by the Supreme Court of the

United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Cullen v. Pinholster*, 563

U.S. 170, 181 (2011); *Williams (Terry) v. Taylor*, 529 U.S. 362, 404–08 (2000).  A "doubly"

deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims

under § 2254.  *See Pinholster*, 563 U.S. at 200–202; *Harrington v. Richter*, 562 U.S. 86, 105

(2011) (same); *Premo v. Moore*, 562 U.S. 115, 122 (2011) (same).  The general rule of *Strickland*,

*i.e.*, to review a defense counsel's effectiveness with great deference, gives the state courts greater

leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions

that are objectively unreasonable under AEDPA."  *Cheney v. Washington*, 614 F.3d 987, 995 (9th

Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies,

"the question is not whether counsel's actions were reasonable.  The question is whether there is

any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*,

562 U.S. at 105; *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (critical question was not

whether court of appeals itself could see substantial likelihood of different result had defendant's

attorney taken different approach; critical question was whether the state court erred so badly that

every fairminded jurist would disagree as to defendant's guilt).  "[I]f a fairminded jurist could

1    agree with either [the] deficiency or prejudice holding, the reasonableness of the other is 'beside

2    the point.'"  *Shinn*, 141 S. Ct. at 524 (quoting *Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per

3    curiam)).

4            Here, the state court did not address this claim directly.  But it implicitly denied the claim

5    because it rejected Petitioner's arguments about the jury instructions and alleged prosecutorial

6    misconduct.  *See* Dkt. No. 14-2 at 20, & n.2 (recognizing that "[d]efendant concedes that no

7    objection was made in the trial court" to the prosecutor's closing argument regarding the kill zone,

8    but choosing in the interest of efficiency to review and reject defendant's argument that he

9    "received ineffective assistance of counsel due to defense counsel's failure to properly object").

10   "When a state court rejects a federal claim without expressly addressing that claim, a federal

11   habeas court must presume that the federal claim was adjudicated on the merits," and thus the

12   claim must be reviewed deferentially under 28 U.S.C. § 2254(d).  *Johnson v. Williams*, 568 U.S.

13   289, 301 (2013).  This rebuttable presumption "is a strong one that may be rebutted only in

14   unusual circumstances."  *Id.* at 302; *Harrington*, 562 U.S. at 99 ("When a federal claim has been

15   presented to a state court and the state court has denied relief, it may be presumed that the state

16   court adjudicated the claim on the merits in the absence of any indication or state-law procedural

17   principles to the contrary.").  "Under §2254(d), a habeas court must determine what arguments or

18   theories supported or, as here, could have supported, the state court's decision; and then it must

19   ask whether it is possible fairminded jurists could disagree that those arguments or theories are

20   inconsistent with the holding in a prior decision of this Court."  *Richter*, 562 U.S. at 102.

21           ii.    **Analysis**

22           Presuming, as the Court must, that the Court of Appeal adjudicated this ineffective

23   assistance claim on the merits, the Court finds that it was not objectively unreasonable in rejecting

24   the claim.  In reviewing a claim that counsel was ineffective for failing to object at trial, the merits

25   of the underlying claim "control the resolution of the *Strickland* claim because trial counsel cannot

26   have been ineffective for failing to raise a meritless objection."  *Juan H. v. Allen*, 408 F.3d 1262,

27   1273 (9th Cir. 2005).  As the Court has already found, the state courts did not act unreasonably in

28   rejecting Petitioner's underlying substantive arguments regarding the instructional and

United States District Court
Northern District of California

prosecutorial misconduct claims.  It follows that raising objections on these grounds would have been meritless, such that it was not objectively unreasonable for the Court of Appeal to conclude that counsel's decision not to object was not constitute prejudicially deficient performance. Habeas relief is thus denied as to this claim.

### E.   Cumulative Error

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  Cumulative error is more likely to be found prejudicial when the government's case is weak.  *See Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2001), *as amended* (Jan. 22, 2002), *and overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where only one (or no) constitutional errors exist, nothing can accumulate to the level of a constitutional violation.  *U.S. v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("[O]ne error is not cumulative error.").

Here, the Court has found no errors, so there is nothing to accumulate to the level of a constitutional violation.  Habeas relief is therefore denied on this ground as well.

## V.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## VI.  CONCLUSION

The petition for a writ of habeas corpus is **DENIED**, and a certificate of appealability is **DENIED**.  The Clerk shall enter judgment in favor of Respondent and close the case.

**IT IS SO ORDERED.**

Dated:   10/24/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

23